IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TY CARTS, LEWIS GROVE, COLIN KRIEGER, BRANDEN RONALD, Individually and on behalf of all other similarly situated individuals, <br><br>                    Plaintiffs, <br><br>                v. <br><br> WINGS OVER HAPPY VALLEY MDF, LLC d/b/a WINGS OVER HAPPY VALLEY, STEVEN C. MOREIRA, and WINGS OVER HAPPY VALLEY, LLC, <br>                    Defendants. | Case No. 4:17-CV-915 <br><br> Judge: Yvette Kane <br><br> Complaint filed: May 24, 2017 <br> Amended Complaint filed: February 12, 2018 <br><br><br><br><br><br> *Electronically Filed* |

**DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION TO CERTIFY CLASS
PURSUANT TO FED. R. CIV. P. 23**

Philip K. Miles III, Esquire
I.D. No. 209425
pkmiles@mqblaw.com
McQUAIDE BLASKO, INC.
811 University Drive
State College, PA 16801
(814) 238-4926

Dated:  October 15, 2018                Attorneys for Defendants

# **TABLE OF CONTENTS**

**Page(s)**

*Table of Authorities* ................................................................................................ ii

INTRODUCTION AND BACKGROUND ............................................................... 1

   A. Counterstatement of Issues ............................................................. 3

   B. Counterstatement of Facts ................................................................. 4

   C. Procedural Posture ............................................................................ 13

ARGUMENT .......................................................................................................... 14

   A. Plaintiffs cannot meet their burden of establishing commonality and predominance because Wings Over does not – nor did it ever - maintain a uniform policy requiring tip pooling or sharing and individual issues predominate over common ones. ....................................................................................... 15

     1. Supreme Court and Third Circuit precedent, further enforced by District Court cases, requires a uniform employment practice and the predominance of class-wide issues over individual issues. ....................................................................... 15

     2. Plaintiffs cannot establish uniform notification of the supposed policy. .............. 18

     3. There was no consistent amount for the alleged tip out requirement. .................. 20

     4. Plaintiffs' lone document actually undercuts their claim of a universal policy. .. 21

     5. Plaintiffs fail to identify any common enforcement of the policy. ........................ 23

     6. Plaintiffs seek class certification from May 2014 through the present, but ignore differences across that timeframe. ................................................................................. 25

     7. Named Plaintiffs' state law claims require additional proof from their federal FLSA Claims. ........................................................................................... 27

   B. The Pennsylvania state law claims of the sought 200+ member class would so thoroughly predominate over the handful of individual drivers seeking relief under the federal FLSA that this Court should decline to exercise supplemental jurisdiction. ................................................................................................ 28

   C. Plaintiffs are inadequate class representatives because they have a track record of dishonesty pertaining to wages, and in some instances a criminal history. They have also been less than forthright with this Court. ................................................... 34

CONCLUSION ....................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods. v. Windsor*, 117 S. Ct. 2231 (U.S. 1997) ........................................................... 17

*Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339 (N.D. Ill. 2012) ......................... 17

*Davis v. Bank of Am., N.A.*, 2016 U.S. Dist. LEXIS 13333, 2016 WL 427049, Civ. No. 13-
4396 (E.D. Pa. February 3, 2016) .......................................................................................... 15

*De Lage Landen Fin. Servs. v. Rasa Floors, LP*, 269 F.R.D. 445 (E.D. Pa. 2010) ............... 19, 23

*Evans v. Lowe's Home Ctrs., Inc.*, No. 3:CV-03-0438, 2006 U.S. Dist. LEXIS 32104 (M.D. Pa.
May 18, 2006) .................................................................................................................. passim

*Gen. Tel. Co. of the Southwest v. Falcon*, 102 S.Ct. 2364 (U.S. 1982) ...................................... 17

*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013) .................................................... 18

*Hernandez v. Ashley Furniture Industries, Inc.*, 2013 U.S. Dist. LEXIS 72387, 2013 WL
2245894 (E.D.Pa.  May 22, 2013) ........................................................................................ 17

*In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., PNC Bank NA*, 795 F.3d 380 (3d
Cir. 2015) ............................................................................................................................... 17

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ............................... 15, 18

*In re Prudential Ins.*, 148 F.3d at 313-14 (3d. Cir. 1998) ......................................................... 17

*Jarosz v. St. Mary Med. Ctr.*, 2014 U.S. Dist. LEXIS 133218, 2014 WL 4722614, Civ. No. 10-
3330 (E.D.Pa. September 22, 2014) ....................................................................................... 17

*Johnston v. HBO Film Mgmt.*, 265 F.3d 178 (3d Cir. 2001) ............................................... 19, 23

*Knepper v. Rite Aid Corp.*, 675 F.3d 249 (3d Cir. 2012) ........................................................... 29

*Maloney v. Microsoft Corp.*, 2012 U.S. Dist. LEXIS 28676, 2012 WL 715856 (D.N.J. March 5,
2012) ................................................................................................................................ 19, 23

*Mielo v. Steak 'N Shake Operations, Inc.*, 897 F.3d 467 (3d Cir. 2018) ................................... 17

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ............. 18

*Ogrizovich v. Cuna Mut. Grp.*, 2013 U.S. Dist. LEXIS 194972, 2:09cv371 (W.D.Pa.,
September 4, 2013) .......................................................................................................... 19, 23

*Pleickhardt v. Major Motors of Pa., Inc.*, 2017 U.S. Dist. LEXIS 153963, 2017 WL 4180112
(M.D.Pa, September 21, 2017) .............................................................................................. 28

*Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325 (3d Cir. 2016) ................................... 27

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (U.S. 2011) ....................................... 15, 16, 19

**Statutes**

28 U.S.C. § 1367 ......................................................................................................................... 31

28 U.S.C. § 1367(c) .................................................................................................................... 29

28 U.S.C. § 1367(c)(2) ................................................................................................................ 28

34 Pa. Code. § 231.34 ................................................................................................................. 28

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................ 14, 15, 39

## INTRODUCTION AND BACKGROUND

Defendants Wings Over Happy Valley MDF, LLC ("WOHV MDF"), Steven C. Moreira, and Wings Over Happy Valley, LLC ("WOHV") (collectively, "Wings Over"[1]) oppose certification of a class in this putative class action. Named Plaintiffs contend that Wings Over maintained a common tip pooling policy for its delivery drivers from May 2014 through the present. The Named Plaintiffs, however, cannot establish the commonality and predominance necessary to justify class certification under Fed. R. Civ. P. 23.

Through limited discovery, the record demonstrates that individual drivers had varying experiences. The four Named Plaintiffs rely on individual conversations with individual managers – meanwhile, three former drivers have submitted affidavits swearing that there was no tip pooling requirement at all. Defendant Moreira and General Manager Jon Street ("GM Street") deny authorizing any tip pooling requirement.

---

[1]For readability, Defendants are collectively referred to as "Wings Over" in this brief. This should not be construed as an admission that the parties are interchangeable, subject to successor liability, or as waiver of individual defenses.

Discovery has likewise revealed no common enforcement of the alleged requirement, and no one was ever disciplined for failing to tip out. Even the percentage of tip pooling allegedly required varies from plaintiff to plaintiff. Named Plaintiffs have failed to produce any documentation of the alleged unlawful policy, except for an unauthorized checklist drafted by a former Named Plaintiff. Drivers also experienced differences across time. None of the Named Plaintiffs have worked at Wings Over for the past 20 months, and they have zero knowledge of any tip pool beyond February 2017. Named Plaintiffs cannot demonstrate a universal policy sufficient to establish commonality and predominance of common issues over individual circumstances.

Even if the circumstances across the 200+ drivers met the commonality and predominance requirements for class certification under Rule 23, this Court should still decline to exercise supplemental jurisdiction. The Pennsylvania state law claims for a class of 200 delivery drivers would predominate over the individual federal claims.

Finally, the Named Plaintiffs are poor class representatives due to dishonesty regarding their wages, in some cases a criminal history, and the

less than forthright representations made to this Court. Plaintiffs' motion

for class certification should be denied.

## A. Counterstatement of Issues

- Under Supreme Court and Third Circuit precedent, Rule 23 requires commonality and predominance (of common facts). Employers must subject the entire class to a common employment practice or policy causing the same harm. Should this Court decline to certify a class where the class members had varying conversations with different individual managers suggesting disparate policies, and no written policy is applicable to the class Named Plaintiffs seek to certify?

   Suggested Answer: Yes.

- Although this Court has discretion to exercise supplemental jurisdiction over state law claims, it should not exercise that jurisdiction where state law claims predominate over federal claims, including with respect to a sheer difference in the number of litigants. Should this Court decline to exercise supplemental jurisdiction over the Pennsylvania class action claims with 200+ drivers, where only a handful of drivers have federal law claims involving different legal standards and individualized assessments?

   Suggested Answer: Yes.

- Are the Named Plaintiffs inadequate class representatives where they have all demonstrated dishonesty pertaining to their wages, some have a criminal history, and their representations to this Court have been less than forthcoming?

   Suggested Answer: Yes.

## B. Counterstatement of Facts

WOHV MDF owned a restaurant doing business as Wings Over Happy Valley until November of 2017.[2] Steve Moreira owns WOHV MDF.[3] In 2017, WOHV purchased WOHV MDF's assets, and after extensive changes, began operating a Wings Over Happy Valley restaurant at the same location.[4] From May 2014 through the present, Wings Over employed over 200 delivery drivers.[5] Wings Over did not maintain a common policy or practice of requiring delivery drivers to share their tipped income.[6]

Several years ago, a delivery driver asked if drivers could share some of their tips with the cook staff to thank them.[7] Wings Over did not object to drivers giving a few dollars of their tips to managers to then give to the cooks, but did not require it.[8] Wings Over was concerned that managers handling tip money might inadvertently coerce drivers to contribute, and wanted to emphasize that contributions were voluntary. In 2014 Wings Over placed a jar in the restaurant for the drivers to voluntarily share their

---

[2]ECF No. 51-1, ¶4.
[3]*Id.* at ¶3.
[4]*Id.* at ¶5; ECF No. 51-2, ¶4.
[5]ECF No. 49, p. 22.
[6]ECF No. 51-1, ¶¶7, 9-14; ECF No. 51-2, ¶¶7, 24.
[7]ECF No. 51-1, ¶6.
[8]ECF No. 51-1, ¶7.

4

tips with cooks, if they desired.[9] This eliminated contact between Wings

Over management and delivery driver's tips.

   Three former delivery drivers confirm that contributions to the tip jar

were voluntary.[10] Moreira and GM Street, also swear that Wings Over

never required delivery drivers to contribute any of their tips to the tip jar –

or to otherwise share their tips.[11] From July, 28, 2014, through the date of

the asset sale in November 2017, Wings Over maintained an Employee

Handbook.[12] All of the Named Plaintiffs received the handbook, which

provides: "Tips are considered part of your wages."[13] Wings Over

faithfully followed this policy, and regarded tips as *drivers'* wages (not the

cooks').[14]

   GM Street provided an orientation to many new hires.[15] He expressly

told them they were not required to put any money in the tip jar and that it

---

[9]ECF No. 51-2, ¶¶9, 12; ECF No. 51-1, ¶8.
[10]ECF No. 51-5–51-7.
[11]ECF No. 51-2, ¶12-13, 24; ECF No. 51-1, ECF No. 51-1, ¶¶9, 25.
[12]ECF No. 51-9.
[13]ECF No. 49-2, pp. 63:25-67:8; ECF No. 49-4, pp. 74:19-77:19; ECF No. 49-1, pp. 36:24-39:4; ECF No. 49-3, pp. 12:16-13:10
[14]ECF No. 51-1, ¶13.
[15]ECF No. 51-2, ¶11.

was voluntary.[16] He explained that Wings Over would never require them to contribute to the tip jar.[17]

The Named Plaintiffs were delivery drivers for Wings Over at various times from May 2014 through February 28, 2017.[18] They allege that through individual interactions with various people, they believed they were required to contribute varying amounts of their tips to the tip jar for the cooks.

Carts claimed that he became aware of the alleged tip-out policy from a manager named Noviello, "but I don't know if he told everyone the same thing because I wasn't there for it."[19] Carts admitted that he was not expressly told there was a tip sharing requirement, but contends it was "strongly implied."[20] Carts further testified that former-Plaintiff Jake Wilson took over as driver manager and never discussed the tip jar with him.[21] Later, Carts became a manager and trained drivers.[22] As a manager,

---

[16]ECF No. 51-2, ¶12.
[17]*Id.*
[18]ECF No. 49-2, pp. 8:17-9:7; ECF No. 49-4, pp. 8:7-15, 58:24-59:3, 63:9-15; ECF No. 49-1, pp. 7:22-25, 8:18-9:2, 33:15-19; ECF No. 49-3, pp. 9:18-20, 41:9-12 .
[19]ECF No. 49-1, pp. 13:5:-10.
[20]ECF No. 49-1, pp. 11:11-13.
[21]ECF No. 49-1, pp. 14:16-20.
[22]ECF No. 49-4, pp. 21:4-14; ECF No. 49-1, pp. 30:5-17.

Carts testified that he personally trained *some* of the drivers to tip out, but did not tell *every* driver he trained about the supposed requirement.[23]

Plaintiff Grove claimed that former-Plaintiff Wilson told him about the alleged tip-out policy toward the end of Grove's first shift.[24] Grove admitted that he neither heard Wilson tell any other drivers they had to tip out nor other drivers say they were told to tip out.[25]  Kreiger testified that he "do[es]n't know what other drivers were told."[26] Ronald acknowledged that he did not witness the orientations for all the other delivery drivers, and therefore could not know what they were told regarding the alleged requirement to tip out.[27] Ronald further acknowledged that he would have no way of knowing whether there were other drivers who were not told about the tip out requirement, or how many.[28]

All of the Named Plaintiffs acknowledged it's possible that other drivers were either not told of the alleged tip out requirement, or did not comply with it. Ronald admitted that other drivers may not have put any

---

[23]ECF No. 49-1, pp. 31:5-13.
[24]ECF No. 49-2, pp. 10:15-21.
[25]ECF No. 49-2, pp. 11:11-18.
[26]ECF No. 49-3, pp. 51:6-9.
[27]ECF No. 49-4, pp. 13:11-14:6
[28]ECF No. 49-4, pp. 19:2-17.

money in the tip jar: "I'm sure that it happened."[29] Grove had "no idea" whether there were other drivers who were never told about the supposed requirement, or drivers who never put money in the tip jar – "It could be possible."[30] When asked if it was possible that there were drivers who did not tip-out during shifts when he was shift supervisor, Carts answered "Yes, it's possible."[31] Likewise, Krieger said, "I do not know. Anything is possible, right?"[32]

The testimony and pleadings of just the four Named Plaintiffs reveal disparity in the supposed tip out requirement. In the Amended Complaint, they alleged that Wings Over required drivers to tip out "approximately 8% of their tips."[33] Yet, *none* of the drivers testified to that. Ronald claims one manager told him 5-10%, and then another told him 10%.[34] Grove testified that former Plaintiff Wilson instructed him to put in "six to eight percent of our tip earnings."[35] Carts testified that it was 5-10% the entire

---

[29]ECF No. 49-4, pp. 53:5-9.
[30]ECF No. 49-2, pp. 12:8-11.
[31]ECF No. 49-1, pp. 47:14-17.
[32]ECF No. 49-3, pp. 40:21-24.
[33]ECF No. 24-2, ¶23.
[34]ECF No. 49-4, pp. 12:20-13:2, 22:5-18.
[35]ECF No. 49-2, pp. 10:15-21.

time.[36] Krieger testified that he was told 5-10% or "five to ten bucks," and the person who trained him did not state any set amount.[37] Krieger further testified that his actual practice was to base the amount of tips he shared with the cooks on how much of their job he "had to do."[38]

Wings Over did not track contributions to the tip jar.[39] Managers did not even know whether someone contributed, or how much.[40]

Half of the Named Plaintiffs claim they refused to tip out but were never disciplined. Grove claimed that "he became vocal about refusing to tip-out at the end of most shifts" but never faced discipline.[41] In fact, zero employees were ever disciplined for failing to abide by the alleged tip out mandate.[42] Krieger claims that he refused to tip out several times, and told the manager on duty it was "bullshit."[43] Despite his refusal, he never was disciplined.[44] Allegedly, the response varied from manager to manager.

[36]ECF No. 49-1, pp. 11:1-10, 15:6-11.
[37]ECF No. 49-3, pp. 14:1-15:24.
[38]ECF No. 49-3, pp. 31:2-3.
[39]ECF No. 51-2, ¶25; ECF No. 51-1, ¶11.
[40]ECF No. 49-1, pp. 33:6-14; ECF No. 49-3, pp. 33:20-22.
[41]Am. Int. Resp. No. 8; ECF No. 49-2, pp. 41:25-42:6 (in the interest of candor, in his deposition, Groves contradicted his own interrogatory response to claim he just complained but did not refuse).
[42]ECF No. 51-1, ¶26; ECF No. 51-2, ¶26; ECF No. 49-2, pp. 44:22-45:2.
[43]ECF No. 49-3, pp. 30: 16-33:19.
[44]*Id.*

Some managers would "not really say anything," and "just let [him] go about [his] day."[45] Krieger even claimed there was "really nothing" they could do.[46]

The sole document relied upon by Plaintiffs is a checklist (the "Wilson Checklist") that was drafted by former-Plaintiff Wilson.[47] Wilson voluntarily withdrew from the lawsuit after Wings Over filed counterclaims against him for lying on his timesheets.[48] The Wilson Checklist vaguely refers to "Mak[ing] sure all drivers tip-out." According to Wilson, he only gave this to two (maybe three) of the driver managers at Wings Over.[49] Wilson's employment ended in December 2016.[50]

Neither Moreira nor GM Street had ever seen the Wilson Checklist before this litigation.[51] Although GM Street had discussed modifying the checklist for closing managers, he never authorized any checklist drafted by Wilson (much less the Wilson Checklist).[52] The Wilson Checklist was

---

[45] *Id*. at 56:18-57:1.
[46] *Id*.
[47] ECF No. 49-6, p.3; Wilson Dep. 104:3-105:9.
[48] ECF No. 9, Answer ¶¶76-100.
[49] ECF No. 51-4, pp. 107:14-118:23.
[50] *Id*., 116:3-11.
[51] ECF No. 51-2, ¶¶17-18; ECF No. 51-1, ¶¶15-16.
[52] ECF No. 51-2, ¶19.

not provided to other managers (beyond Wilson's alleged limited distribution), and was not followed by other managers.[53] Instead, Wings Over utilized an official Closing Managers Duties checklist ("WOHV Checklist").[54] The WOHV Checklist states no tip out requirement, and was last modified on February 8, 2015.[55]

On September 26, 2016, Moreira received a letter from one of his former employees claiming the existence of an "illegal tip pool."[56] Moreira met with counsel to discuss this allegation. Thereafter, Moreira reiterated to drivers that putting money in the tip jar was voluntary.[57] Even former Plaintiff Wilson acknowledged that sharing tips was voluntary as of October 2016, and that all drivers were told it was voluntary.[58] An October 28, 2016 email further documents that tip sharing was voluntary, and that drivers knew it was voluntary.[59]

Although none of the Named Plaintiffs worked at Wings Over after February 2017, they seek class certification through the present. The

---

[53]ECF No. 51-2, ¶¶18-22.
[54]ECF No. 51-2, ¶22; ECF No. 51-10.
[55]ECF No. 51-2, ¶23; ECF No. 51-10.
[56]ECF No. 51-11.
[57]ECF No. 51-1, ¶¶22-25.
[58]ECF No. 51-4, pp.  35:19-39:23.
[59]ECF No. 51-12.

Named Plaintiffs alleged "[u]pon information and belief" that the

defendants "continue[d] to require" the unlawful tip pooling as of January

30, 2018.[60] However, in depositions, *every* Named Plaintiff denied having

any reason to believe this allegation:

- Ronald - When asked the basis for this allegation, repeatedly said, "I do not know."[61]

- Grove - "I have no idea what drivers were told after I left."[62] And when asked if drivers continued to put money in the tip jar after he left in January of 2017, he replied "I have no – no idea, no knowledge of anything."[63] "I know nothing about practices beyond the last date that I was at the restaurant working."[64]

- Krieger – Confessed that he had "no idea" what the tip policy was after he left in December 2016.[65]

- Carts – similarly testified that he had "[n]o idea" whether drivers who started after May 7th, 2016 were told about a tip out requirement because, "I wasn't there anymore."[66]

 When new owners began operating the new Wings Over restaurant

following the asset sale in November 2017, they adopted their own policies

and procedures. Per the new Team Member Handbook given to all

---

[60]ECF No. 24-2, ¶23.
[61]ECF No. 49-4, pp. 66:11-69:11.
[62]ECF No. 49-2, pp. 57:1-7.
[63]*Id.* at 57:11-15.
[64]*Id.* at 59:22-60:7.
[65]ECF No. 49-3, pp. 43:16-44:1.
[66]ECF No. 49-1, pp. 33:20-34:1.

employees, "Tips are not pooled or shared."[67] GM Street has further

testified that Wings Over enforces the policy as written.[68].

The record reflects the following:

| | |
|---|---|
| May 24, 2014 | Purported start date for the sought after class. |
| July 28, 2014 | Wings Over adopts an employee handbook expressly stating "Tips are considered part of your wages." |
| October 2016 | Former plaintiff Wilson acknowledges tip sharing is voluntary; email expressly states that it is voluntary. |
| February 2017 | Latest date any Named Plaintiff was employed by Wings Over; they have "no idea" what happened after their respective leave dates. |
| November 2017 | New ownership purchases assets and implements new Team Member Handbook expressly stating that "Tips are not pooled or shared." |
| October 2018 (through present) | End date for sought after class. |

## C. Procedural Posture

The parties conducted discovery relating to class certification, including

interrogatories, requests for production of documents, and depositions of

all of the Named Plaintiffs, and former-Plaintiff Wilson. On October 1,

---

[67]ECF No. 51-3, ¶8; ECF No. 51-8.
[68]ECF No. 51-3, ¶8.

2018, Plaintiffs sought certification of a class for their Pennsylvania state law claims under Fed. R. Civ. P. 23.[69] Plaintiffs contemporaneously sought conditional certification of a collective action under the Fair Labor Standards Act.[70] Defendants oppose both motions for the reasons set forth in their briefs, filed concurrently on October 15, 2018.

## ARGUMENT

Plaintiffs' motion to certify a class of all drivers from May 2014 through the present should be denied for three overarching reasons:

1. Wings Over did not maintain a common employment policy of requiring drivers to tip out – a fact confirmed by the extraordinary differences between the testimony of the few drivers from whom we have testimony or sworn statements.

2. The Pennsylvania state law class action claims so thoroughly predominate over the handful of individual federal claims that this Court should decline to exercise supplemental jurisdiction over the state law class action.

3. The plaintiffs are not adequate representatives because of their proven and admitted dishonesty regarding their wages, and in some instances, criminal backgrounds, and misrepresentations to this Court.

---

[69]ECF No. 47; ECF No. 49.
[70]ECF No. 48; ECF No. 50.

**A. Plaintiffs cannot meet their burden of establishing commonality and predominance because Wings Over does not – nor did it ever - maintain a uniform policy requiring tip pooling or sharing and individual issues predominate over common ones.**

Wings Over did not have a common policy applicable to all drivers across the putative class. Instead, the four Named Plaintiffs rely on individual conversations varying from manager to manager. Meanwhile, three drivers have sworn they were never required to share their tips at all. Named Plaintiffs also fail to address differences in circumstances across time, and have no knowledge of any employment practices after February 2017. This Court should deny certification of the class because of the extraordinary variations from driver to driver across the putative class.

*1. Supreme Court and Third Circuit precedent, further enforced by District Court cases, requires a uniform employment practice and the predominance of class-wide issues over individual issues.*

Plaintiffs bear the burden of demonstrating that they meet the requirements of Rule 23 for certifying a class action.[71] In *Wal-Mart v. Dukes*, the Supreme Court raised the bar for the commonality requirement of Rule 23(a)(3):

---

[71] *See Davis v. Bank of Am., N.A.*, 2016 U.S. Dist. LEXIS 13333, 2016 WL 427049, Civ. No. 13-4396, at *9 (E.D. Pa. February 3, 2016) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) for the proposition that there must be a "rigorous analysis" of whether "the prerequisites of Rule 23 are met").

> What matters to class certification . . . is not the raising of
> common questions—even in droves—but, rather the capacity of
> a classwide proceeding to generate common answers apt to
> drive the resolution of the litigation. Dissimilarities within the
> proposed class are what have the potential to impede the
> generation of common answers.[72]

The Supreme Court focused on the lack of a uniform rule applicable to all class members. In summarizing *Dukes*, the Third Circuit in *Rodriguez* explained:

> The *Dukes* plaintiffs were all subjected to the discretion of their
> supervisors, but they had not demonstrated "a common mode
> of exercising discretion that pervades the entire company," *such
> that the policy could be considered a "<u>uniform employment practice</u>"
> <u>that all members of the putative class had experienced</u>*. Rather, the
> *Dukes* plaintiffs encountered different managers making
> different types of employment decisions for different reasons,
> many of them likely nondiscriminatory in nature. *They therefore
> had not been subjected to a common harm, and the proposed class
> lacked commonality*.[73]

Indeed, as the Third Circuit has observed following *Dukes*, "to bring a case as a class action, the named plaintiffs must show that each class member was subjected to the specific challenged practice in roughly the same manner."[74]

---

[72] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 (U.S. 2011).

[73] *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 383 (3d Cir. 2013) (citing *Dukes*, 131 S. Ct. at 2254-55) (emphasis added).

[74] *Id.* at 383 (*citing Dukes*, 131 S. Ct. at 2555-56).

Even more recently, the Third Circuit observed that "[a] complaint's mere recital of questions that happen to be shared by class members is 'not sufficient to obtain class certification'….Rather, '[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"[75] Other district courts have recognized that individualized inquiries required to demonstrate that potential class members suffered the same type of harm as named plaintiffs may "preclude a finding of commonality."[76]

In addition to commonality, Plaintiffs must also establish that "[i]ssues common to the class . . . predominate over individual issues."[77] This requirement under Rule 23(b) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[78] The predominance standard is "far more demanding" than the commonality

---

[75] *Mielo v. Steak 'N Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018) (*quoting Dukes*, 131 S.Ct., at 2551, in turn *quoting Gen. Tel. Co. of the Southwest v. Falcon*, 102 S.Ct. 2364, 2370 (U.S. 1982)).

[76] *See Jarosz v. St. Mary Med. Ctr.*, 2014 U.S. Dist. LEXIS 133218, 2014 WL 4722614, Civ. No. 10-3330, at *26-27 (E.D.Pa. September 22, 2014) (*citing Hernandez v. Ashley Furniture Industries, Inc.*, 2013 U.S. Dist. LEXIS 72387, 2013 WL 2245894, at *7-10 (E.D.Pa.  May 22, 2013); and *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 354-55 (N.D. Ill. 2012)).

[77] *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., PNC Bank NA*, 795 F.3d 380 (3d Cir. 2015) (*citing In re Prudential Ins.*, 148 F.3d at 313-14 (3d. Cir. 1998)).

[78] *Id.* (*citing Amchem Prods. v. Windsor*, 117 S. Ct. 2231, 2249 (U.S. 1997)).

requirement.[79] "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."[80] If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.[81] "The predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized evidence."[82]

    *2. Plaintiffs cannot establish uniform notification of the supposed policy.*

    Plaintiffs rely on individual conversations with different managers regarding an alleged requirement to put money in a tip jar. They ask this Court to leap to the conclusion that all members of the putative class must have had similar individual conversations with whomever trained each of them. Whether any such conversations actually occurred would require

---

[79] *Id.*

[80] *Id.* (*citing In re Hydrogen Peroxide*, 552 F.3d 305, 311 (3d Cir. 2008)).

[81] *See id.* (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 181 (3d Cir. 2001)).

[82] *Id.* (*quoting Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir. 2013)).

individualized evidence from hundreds of conversations between managers and delivery drivers.

"[I]t has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action."[83] This Court has applied this well-settled principle in the context of wage and hour litigation.[84] Here, Named Plaintiffs contend that they were orally informed about the policy. Setting aside the known differences already on the record, this Court must also consider the potential for unknown differences that surely exist across the hundreds of interactions between the 200+ drivers and managers. Class action litigation is not appropriate where questions about individual conversations predominate over common questions across the class.

Like the plaintiffs in *Dukes* and *Rodriguez*, the Named Plaintiffs in this case cannot demonstrate a "uniform employment practice" that all members of any putative class have experienced or been similarly injured

---

[83] *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 190 (3d Cir. 2001) (citations omitted); *Ogrizovich v. Cuna Mut. Grp.*, 2013 U.S. Dist. LEXIS 194972, 2:09cv371, at *22-23 (W.D.Pa., September 4, 2013); *Maloney v. Microsoft Corp.*, 2012 U.S. Dist. LEXIS 28676, 2012 WL 715856, at *9 (D.N.J. March 5, 2012); *De Lage Landen Fin. Servs. v. Rasa Floors, LP*, 269 F.R.D. 445, 464 (E.D. Pa. 2010).
[84] *Evans v. Lowe's Home Ctrs., Inc.*, No. 3:CV-03-0438, 2006 U.S. Dist. LEXIS 32104, at *27 (M.D. Pa. May 18, 2006).

by. The "policy" appears to be embodied only in disparate oral communications and an unauthorized checklist concocted by a former Named Plaintiff. Further, while Named Plaintiffs allege that the two hundred-person class of delivery drivers were subjected to an illegal mandatory tip pool by Wings Over Happy Valley MDF, LLC, and that all putative class members were injured by having to give up a percentage of their tips as a result, delivery drivers nearly equal in number to the Named Plaintiffs have sworn that they were *never* required to share any of their tips.

In this case, there simply was no "uniform employment practice," members of the class that Named Plaintiffs seek to certify did not "suffer the same injury," and, even assuming this Court finds Plaintiffs remotely credible (*infra*), the experiences of similarly-situated former delivery drivers were diametrically opposite to those asserted by Named Plaintiffs.

*3. There was no consistent amount for the alleged tip out requirement.*

The four Named Plaintiffs could not identify a consistent amount for the alleged tip pool requirement. Between the pleadings and the depositions, the four Named Plaintiffs claim they were required to contribute 8%, 5%-10%, 10%, 6%-8%, or "five to ten bucks." Almost as

many drivers have submitted affidavits that there was no requirement at all. Moreira and GM Street also swear there was no such requirement. With so many inconsistencies across just the four Plaintiffs and the five affiants, one can only imagine the different stories we might hear from the 200+ putative class members.

4. *Plaintiffs' lone document actually undercuts their claim of a universal policy.*

Plaintiffs produced the Wilson Checklist, which they assert "was followed by the driver managers and applied uniformly to all Delivery Drivers."[85] The record paints a different picture. First, the checklist was drafted by one of the (now-former) Named Plaintiffs in this case, who withdrew from the action following the filing of counterclaims against him for lying on his timesheets. Wilson doesn't know when he drafted the Wilson Checklist, which may have been in 2015 (after the start of the putative class).[86]

Wilson's own testimony undercuts the Plaintiffs' contention that the Wilson Checklist embodied a universal policy. Far from being followed by all managers, Wilson only gave it to two (maybe three) other managers –

---

[85]ECF No. 49, p. 15; ECF No. 49-6.
[86]ECF No. 51-14, p. 109.

admitting, "I don't know who I gave it to . . . . I can't remember."[87] Wilson

further acknowledged that the alleged tip out requirement on his checklist

was obsolete by October 2016, at the latest.[88] At best, the Wilson Checklist

is a self-serving document drafted by a now-former lead Plaintiff, after the

start of the putative class sought by Named Plaintiffs, that was only

provided to a couple of other managers, and was obsolete at least two

years ago.

Further still, the Wilson Checklist conflicts with the actual written

policies of Wings Over. Wings Over maintains an official Closing Manager

Duties checklist, which makes no mention of any tip out requirement.[89]

The Employee Handbook in effect from July 2014 through the date of the

asset sale in November 2017 specifically characterizes tips as the property

of the delivery drivers who receive them[90]. Following the asset sale, a

newly-adopted Member Handbook went even further by prohibiting tip

pooling.[91] The Wilson Checklist was never approved or adopted by Wings

---

[87]*Id.,* pp. 108, 110.
[88]*Id.,* pp. 35-36.
[89]ECF No. 51-2, ¶¶22, 23; ECF No. 51-10.
[90]ECF No. 51-2, ¶22; ECF No. 51-10.
[91]ECF No. 51-3, ¶8; ECF No. 51-8.

Over[92]. Neither Moreira nor GM Street had even seen it prior to this litigation.[93] The Wilson Checklist was not widely distributed or followed by other managers.[94]

Plaintiffs have failed to produce any true documented basis for the alleged policy.  As such, this Court should deny class certification.[95]

     *5. Plaintiffs fail to identify any common enforcement of the policy.*

Half of the Named Plaintiffs claim they refused to tip out but were never disciplined. Grove claimed that "he became vocal about refusing to tip-out at the end of most shifts" and yet he never faced any discipline.[96] Krieger claims he refused to tip out several times, telling the manager on duty that it was "bullshit."[97] Despite his blatant refusal to comply with what Named Plaintiffs characterize as a "requirement," he never faced any discipline.[98] In fact, according to Krieger, the response varied from manager to manager. Some managers would "not really say anything,"

---

[92]ECF No. 51-2, ¶19.
[93]ECF No. 51-2, ¶¶17-18; ECF No. 51-1, ¶¶15-16.
[94]ECF No. 51-2, ¶¶18-22.
[95] See, *Johnston*, *Evans*, *Ogrizovich*, *Maloney*, and *De Lage Landen Fin. Servs.*, *supra.*
[96]Am. Int. Resp. No. 8, ECF No. 49-2, p. 37 (he later contradicted his own discovery response and claimed he did not refuse).
[97]ECF No. 49-3, pp. 30-33.
[98]*Id.*

and "just let [him] go about [his] day."[99] Krieger even claimed that there

was "really nothing" they could do.[100]

If Wings Over really maintained the policy alleged, there was plenty it

*could* do, from firing or disciplining employees who refused to share their

tips, to tracking the amount of contributions from each employee, to

factoring in the "tip out" when cashing out the drivers at the end of the

night, etc. Yet, Wings Over did none of that. Wings Over never disciplined

a single employee for failing to comply with the so-called requirement.[101]

Even assuming *arguendo* that Wings Over maintained the alleged tip

pool requirement, this Court has no way of knowing how many of the

putative class members refused to tip out, or how often. All of the Named

Plaintiffs and Wilson acknowledged that it was possible drivers did not tip

out, at least some of the time.[102] Three drivers already swear that they were

***never*** required to tip out. Determining who actually put money in the tip

jar, on what shifts, and whether they faced any repercussions if they

refused to do so, necessarily requires an individualized inquiry. There was

---

[99]*Id.* at 56-57.
[100]*Id.*
[101]ECF No. 51-1, ¶10.
[102]ECF No. 51-4, p. 57:1-9; ECF No. 49-1, p. 29:16-20; ECF No. 49-3, p. 40:21-24; ECF No. 49-2, pp. 11:22-12:11; and ECF No. 49-4, p. 27:4-8.

no universal or common enforcement policy, and therefore individual circumstances predominate over any common questions.

*6. Plaintiffs seek class certification from May 2014 through the present, but ignore differences across that timeframe.*

Plaintiffs seek certification of a class of all drivers from May 2014 through the present, but ignore differences across this timeframe. For example, on July 28, 2014, Wings Over adopted an Employee Handbook expressly stating "Tips are considered part of your wages."[103] Wings Over enforced the policy as written, and tips were treated as the drivers' wages.[104] The written handbook was implemented after the start of the purported class.

On September 26, 2016, Moreira received a letter from one of his former employees claiming the existence of an "illegal tip pool."[105] After receiving this letter, Wings Over reiterated that any sharing of tips was voluntary.[106] Even former Named Plaintiff Wilson acknowledged that tipping out was voluntary as of October 2016, and that all drivers were told it was

---

[103]ECF No. 51-1, ¶13 and ECF No. 51-9.
[104]*Id.*
[105]ECF No. 51-11.
[106]ECF No. 51-1, ¶¶22-25.

voluntary.[107] An October 28, 2016 email further documents that that tip

sharing was voluntary and drivers knew it was optional.[108]

Incredibly, the plaintiffs alleged in their pleadings that Wings Over

continued to require drivers to contribute to the tip jar through January of

2018.[109] None of the Named Plaintiffs have worked at Wings Over since

February 2017. Despite this allegation, *every* Named Plaintiff admitted he

had no idea whether the allegation was true and no basis for pleading it.[110]

Aside from further obliterating their credibility,[111] this shows there is no

basis to seek class certification through the present.

Further, when new owners began operating the new Wings Over

restaurant in November 2017, they adopted their own policies and

procedures. Per the new Team Member Handbook, given to all employees,

"Tips are not pooled or shared."[112] The General Manager has sworn that

---

[107]ECF No. 51-4, pp.  35:19-39:23.
[108]ECF No. 51-12.
[109]ECF No. 24-2, ¶23.
[110] ECF No. 49-4, pp.  66:11-69:11; ECF No. 49-2, pp. 57:1-15, 59:22-60:7; ECF No. 49-3, pp. 43:16-44:1; ECF No. 49-1, pp. 33:20-34:1.
[111] *See also, infra.*
[112] ECF No. 51-3, ¶8; ECF No. 51-8.

Wings Over enforces the policy as written.[113] The Named Plaintiffs collectively have "no idea" about the policies at the new Wings Over.

There is no basis for asserting that any driver was subjected to a common tip pooling policy after the last named plaintiff's employment ended in February of 2017. The changes over time highlight the lack of a common employment policy or practice applicable to all drivers in the putative class, and that individual factual circumstances predominate.

>    7.  *Named Plaintiffs' state law claims require additional proof from their*
>    *federal FLSA Claims.*

In addition to the factual inconsistencies, Named Plaintiffs' asserted state law claims necessitate individualized analyses owing differing legal standards. Where an "essential element of the cause of action requires proof of an individualized nature, as required here, certification is inappropriate."[114]

Material differences may exist between FLSA and PWPCL claims[115]. PWPCL claims require additional testimony and proof beyond that

---

[113] ECF No. 51-3, ¶8.

[114] *Evans, supra* at *25-27 (further describing the "highly individualized inquiries" under the PMWA and state law actions involving subjective criteria).

[115] *Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 329 n. 4 (3d Cir. 2016).

required for FLSA actions[116]. While a *written* contract is not required to

support a PWPCL claim, this Court has held that a plaintiff must plead the

existence of some *contractual agreement* to pay wages.[117]  No contract has

been pleaded in this action. This Court must also assess, on a case-by-case

basis, whether any of the other 200 delivery drivers actually reported their

tips as required by the PMWA's implementing regulations[118] (*infra*).

**B. The Pennsylvania state law claims of the sought 200+ member class would so thoroughly predominate over the handful of individual drivers seeking relief under the federal FLSA that this Court should decline to exercise supplemental jurisdiction.**

Plaintiffs' Pennsylvania law claims predominate the action,

overshadowing their tiny putative FLSA opt-in collective by overwhelming

numbers for purposes of this Court's discretionary exercise of

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(2). A petite set of

Named Plaintiffs, if certified as an opt-in collective action, would result in

a federal tail attempting to wag a disproportionately large state law dog.

---

[116]*Id.*
[117]*Pleickhardt v. Major Motors of Pa., Inc.*, 2017 U.S. Dist. LEXIS 153963, 2017 WL 4180112, at *12 (M.D.Pa, September 21, 2017).
[118]*See* 34 Pa. Code § 231.34.

Rule 23 class actions for state law claims are not inherently incompatible with FLSA actions.[119] There sometimes exist, however, factual circumstances under which it is appropriate for a district court to decline supplemental jurisdiction. Under such circumstances, a district court should refuse to certify a class of plaintiffs bringing state law claims, in conjunction with a much smaller collective FLSA action.

In *De Asencio*, employees of Tyson Foods filed a collective opt-in FLSA action for unpaid wages, but also sought certification of an opt-out class for Pennsylvania Wage Payment and Collection Law ("PWPCL") claims arising from the same facts. The Eastern District of Pennsylvania initially certified the class. On appeal, however, the Third Circuit reversed, finding an exercise of supplemental jurisdiction in furtherance of class certification of the state law claims to be an abuse of discretion.[120]

The *De Asencio* Court observed that under 28 U.S.C. § 1367(c), there are "explicit circumstances under which a district court may decline to exercise supplemental jurisdiction."[121] Because the FLSA does not address the supplemental jurisdiction question, the Court looked to Section 1367(c)'s

[119]*See Knepper v. Rite Aid Corp.*, 675 F.3d 249, 261-62 (3d Cir. 2012).
[120]*De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301 (2003).
[121]*Id.* at 308.

statutory language.[122] The *De Asencio* Court recognized that substantial

predomination under Section 1367, exists "where a state claim constitutes

the real body of a case, to which the federal claim is only an appendage –

only where permitting litigation of all claims in the district court can

accurately be described as allowing a federal tail to wag what is in

substance a state dog."[123] The Court held that the Eastern District abused

its discretion in certifying a Rule 23 opt-out class over plaintiffs'

Pennsylvania law claims because those claims – not the FLSA claims

brought by a few opt-in plaintiffs – formed the real body of the case.

The Third Circuit then observed that the "disparity in numbers here

give us pause. In terms of the number of plaintiffs, the sheer difference in

numbers between the two prospective classes, 447 as opposed to 4,100,

may constitute substantial predomination by the state WPCL action under

section 1367."[124]

> Generally, the distinction between opt-in and opt-out classes is
> crucial.  Under most circumstances, the opt-out class will be
> greater in number, perhaps even exponentially greater.  Opt-
> out classes have numbered in the millions. *See In re Prudential*,
> 148 F.3d at 289-90. The aggregation of claims, particularly as

---

[122]*See, Id.* at 309; *see also* 28 U.S.C. § 1367(c)(2).
[123]*Id.* at 309.
[124]*Id.*, 342 F.3d, at 310 (emphasis added).

> class actions, profoundly affects the substantive rights of the
> parties to the litigation.  Notably, aggregation affects the
> dynamics for discovery, trial, negotiation and settlement, and
> can bring hydraulic pressure to bear on defendants.  The more
> aggregation, the greater the effect on the litigation.[125]

Thus, while predomination under 28 U.S.C. § 1367 generally goes to the type of claim, rather than to the number of parties involved, "the disparity in numbers of similarly situated plaintiffs may be so great that it becomes dispositive by transforming the action to a substantial degree, by causing the federal tail represented by a comparatively small number of plaintiffs to wag what is in substance a state dog."[126] Indeed, this Court has found the *De Asencio* Court's supplemental jurisdiction reasoning to be "compelling" where "the difference in the number of members in the opt-in (499) versus the opt-out (1,317) plaintiffs is significant."[127] Here, the contrast in numbers is even vaster.

There are only four Named Plaintiffs and another four FLSA opt-ins. By contrast, the opt-out class that Plaintiffs seek to certify for state law

---

[125]*Id.*
[126]*Id.*, 342 F.3d, at 311.
[127]*See Evans, supra*, at *19.

claims consists of *hundreds* of delivery drivers.[128] The ratio of opt-in Plaintiffs to Rule 23 class population in *De Asencio* was approximately 1 to 10 and the ratio in *Evans* was approximately 1 to 3. Here, Plaintiffs ask this Court to exercise supplemental jurisdiction over their asserted PWPCL and PMWA claims for a staggering ratio of approximately 1 to 25.

It is also important to note that these eight Named and ostensible opt-in FLSA Plaintiffs are likely the *only* plaintiffs whose FLSA claims overlap with the timespan applicable to the state law claims for which Plaintiffs seek to certify a Rule 23 opt-out class. Momentarily setting aside the affidavits of former delivery drivers affirmatively swearing that they were *never* required to share their tips, former Named Plaintiff Wilson testified that, as of October[129] 2016, the alleged tip pool was clearly voluntary[130].

Class claimants must suffer an injury, at a "relevant time."[131] As a primary matter, "the relevant timed period" is "drastically restricted by the

---

[128]ECF No. 49, p. 15 ("the number of Delivery Drivers at the Restaurant exceeds 200 individuals.").

[129]At latest, October 28, 2016.

[130]ECF No. 51-4, pp. 35:19-39:23.

[131]*See, e.g., Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 347 n. 12 (3d Cir., 2011); and *Rittle v. Premium Receivables, LLC*, 2016 U.S. Dist. LEXIS 120798, Civil Action No.: 1:15-CV-166, at *2 (M.D.Pa. September 6, 2016).

applicable statute of limitations."[132] The statute of limitations under the

FLSA is two (2) years, unless extended for a willful violation.[133] This

limitations period dates back from the present to October 2016. As such,

any additional plaintiffs (beyond the eight total named and opt-in

Plaintiffs) seeking to opt into the FLSA claims going forward would have

only ostensible claims for the time period dating back to October 2016, at

which point it is clear from former-Plaintiff Wilson's testimony that any

sharing of tips was voluntary.[134] That period of time does *not* overlap with

the time period encompassing any plausible Rule 23 class for Pennsylvania

law claims (dating back up to three years prior to the filing of the

Complaint in May of 2017, recognizing that such claims would not be

viable past October 2016, per the evidence of record including Wilson's

testimony).

  While Plaintiffs *attempt* to invoke this Court's supplemental jurisdiction

in order to certify a Rule 23 class action through the present date, they

clearly cannot meet their burden for such a prolonged timespan. In

addition to Wilson's testimony that any tip sharing was voluntary as of

---

[132]*See Jackson v. SEPTA*, 260 F.R.D. 168, 187 (E.D. Pa. 2009).
[133]*See Souryavong v. Lackawanna Cnty.*, 872 F.3d 122, 126 (3d Cir. 2017).
[134]ECF No. 51-4, pp. 35:19-39:23.

October 2016 at the latest, *all* of the Named Plaintiffs have testified that they have no knowledge or information pertaining to Wings Over's policies after their respective employment there ended.[135] Moreover, as Plaintiffs acknowledge, the Restaurant's assets were sold by Wings Over Happy Valley MDF, LLC to Wings Over Happy Valley, LLC, as of November, 2017.[136]

In other words, the end of any plausible Rule 23 class would have little to no overlap with the start of any new opt-in plaintiffs' federal FLSA claims. So, not only does the large number of Rule 23 opt-out plaintiffs currently predominate over the small number of federal FLSA opt-out plaintiffs, but that disparity is unlikely to change much, if at all. This Court should therefore decline to exercise supplemental jurisdiction over the state law claims.

### C. Plaintiffs are inadequate class representatives because they have a track record of dishonesty pertaining to wages, and in some instances a criminal history.  They have also been less than forthright with this Court.

---

[135]ECF No. 49-1, pp.  8:18-19; 25:5-7; and 33:20-34:1; ECF No. 49-2, pp. 9:5-7; 57:1-15; ECF No. 49-4, pp.  59:1-3; 63:9-64:8; and ECF No. 49-4, pp. 41:9-12; 43:3-21.
[136]ECF No. 49, pp. 4-5.

The Named Plaintiffs are inadequate class representatives. Generally speaking, dishonesty, prior convictions and a lack of forthrightness can render putative class representatives inadequate.[137]

Named Plaintiffs have not been completely forthright with this Court. For one, they represented that "[u]nlike the other Plaintiffs, Mr. Krieger has a criminal history."[138] While they further acknowledge that Krieger "was convicted of assault and related offenses", they contend that "those convictions resulted from a drug addiction that no longer afflicts Mr. Krieger" and that "Mr. Krieger has been clean for approximately seven years." Krieger testified that drugs were involved in "all of" his criminal convictions.[139] However, Krieger also testified that he has "been clean for

---

[137]*See, e.g., Sloane v. Gulf Interstate Field Servs.*, 2017 U.S. Dist. LEXIS 43088, No. 4:16-cv-01571, at *66-69 (M.D.Pa. March 24, 2017); *see also Bontempo v. Wolpoff & Abramson*, 2007 U.S. Dist. LEXIS 102448, No. 06-745, at *28 (W.D.Pa. December 14, 2007) ("Bontempo's misrepresentations concerning his agreements with MBNA – agreements that will [be] relied upon by class members in asserting their claims against W&A – and his dishonesty in seeking to eliminate his credit card debts that underlie his FDCPA claims, make Bontempo an inadequate class representative under Rule 23(a)(4).")' and *McCall v. Drive Fin. Servs., L.P.*, 236 F.R.D. 246 (E.D.Pa. 2006) (emphasizing that dishonesty or credibility concerns may cast doubt on ability of persons to adequately represent a class where such putative representatives "were dishonest or lacked candor about matters central to the litigation itself.")
[138]ECF No. 49, p. 5.
[139]ECF No. 49-3, at 55.

seven years."[140] Despite this testimony, a search of Pennsylvania's Unified Judicial System dockets revealed that Krieger pleaded guilty to an assault charge as recently as July 2017 [ECF No. 51-13]. Krieger failed to mention this at his deposition (held September 24, 2018). It is not possible for Krieger to have been clean for seven years, and for drugs to have been involved in all of his convictions. While it is not clear whether Krieger is a violent criminal without the influence of drugs or if he simply continues to use drugs and lied about that fact at his deposition, he is not an adequate class representative for potentially credible, non-criminal employees throughout the putative class.

Named Plaintiffs likewise omitted that Plaintiff Ronald also previously pleaded guilty to possession of drug paraphernalia before the Somerset County Court of Common Pleas. The Amended Complaint filed on behalf of the Named Plaintiffs asserts the existence of an illegal tip pool through the present, despite that Named Plaintiffs have "no idea" what happened after they left. This blatant attempt to assert direct liability against WOHV without any factual support impugns their credibility.

---

[140]*Id.*

More to the heart of the matter, Named Plaintiffs admit that they failed to honestly report their tips.[141] Their dishonest tip reporting goes directly to their wages and this litigation. These admissions are particularly important to class certification in this case because Named Plaintiffs are seeking to certify a class to pursue claims under the Pennsylvania Minimum Wage Act.

Pennsylvania's Secretary of Labor and Industry is expressly authorized under the PMWA to promulgate implementing regulations.[142] Pursuant to that express statutory authority, and in contrast to federal policy[143], the Secretary promulgated a regulation providing that, "[a]n employee failing or refusing to report to the employer the amount of tips received in any workweek *shall not be permitted to show that the tips received were less than the amount determined by the employer in the workweek*."[144] In Pennsylvania, regulations embodying an agency's interpretation of law have the force

---

[141]ECF No. 49-1, pp. 22:5-24:21; ECF NO. 49-2, pp.  29:21-34:9; ECF No. 49-4, pp. 49:3-50:17; ECF No. 49-3, pp. 33:20-36:6.

[142]*See* 43 P.S. § 333.109.

[143]In *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711 (3d Cir. 2001), the Third Circuit Court of Appeals affirmed a backpay award under the NLRA based, in part, upon unreported tip income.  The Third Circuit concluded that federal tax policy would be preserved, despite the disparity in reported tips and tips claimed for the purpose of seeking backpay, because the drivers remained subject to criminal prosecution for tax evasion.

[144]34 Pa. Code. § 231.34 (emphasis added).

and effect of law.[145] Pennsylvania has made a policy choice, differing from the Third Circuit's treatment of misrepresented tip income in federal actions. Pennsylvania chose to prohibit employees who misrepresent their tips from later attempting to demonstrate amounts in excess of what they reported (a form of regulatory estoppel).

In addition to Named Plaintiffs' lack of credibility, the state law claims require individualized analyses, which further demonstrate their inadequacy as representatives for the putative class. Because the PMWA regulation requires accurate reporting of tips as a prerequisite for an employee to "show" additional tips beyond what he or she reported, the Named Plaintiffs' admitted fraud in underreporting their tips to Defendants and the federal tax authorities likely stymies their PMWA claims. At a minimum, it renders Named Plaintiffs inadequate class representatives for other employees who may have complied with the law by honestly reporting their tips. Moreover, as noted *supra*, Named Plaintiffs have not pleaded the existence of a contract in this case. Because a contract is required to assert PWPCL claims, Named Plaintiffs are ill-

---

[145]*See Reuther v. Del. Cty. Bureau of Elections*, 172 A.3d 738, 744 n. 13 (Pa. Cmwlth. 2017) (*citing Borough of Bedford v. Dept. of Envtl. Prot.*, 972 A.2d 53, 61 (Pa. Cmwlth. 2009)).

equipped to represent the interests of any employees who may have had a

contract, express or implied.

## CONCLUSION

 This Court should deny Named Plaintiffs' Motion to Certify Class

Pursuant to Fed. R. Civ. P. 23 because:

1. They fail to meet their burden of establishing commonality and predominance under Rule 23 because the circumstances for individual drivers vary so greatly;

2. Supplemental jurisdiction is inappropriate because the large number of state law claims predominate over the relatively small number of federal claims; and

3. The Named Plaintiffs are inadequate class representatives.

Respectfully submitted,

McQUAIDE BLASKO, INC.

Dated:  October 15, 2018          By:  */s/Philip K. Miles III*

Philip K. Miles III, Esquire
I.D. No. 209425
pkmiles@mqblaw.com
811 University Drive
State College, PA 16801
(814) 238-4926
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TY CARTS, LEWIS GROVE, COLIN KRIEGER, BRANDEN RONALD, Individually and on behalf of all other similarly situated individuals,<br><br>                    Plaintiffs,<br><br>          v.<br><br>WINGS OVER HAPPY VALLEY MDF, LLC d/b/a WINGS OVER HAPPY VALLEY, STEVEN C. MOREIRA, and WINGS OVER HAPPY VALLEY, LLC,<br><br>                    Defendants. | Case No. 4:17-CV-915<br><br>Judge: Yvette Kane<br><br>Complaint filed: May 24, 2017<br>Amended Complaint filed: February 12, 2018<br><br><br><br>*Electronically Filed* |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **Defendants' Brief in Opposition to Plaintiffs' Motion to Certify Class Pursuant to Fed.R.Civ.P. 23** in the above-captioned matter was served via ECF this 15th day of October, 2018, to counsel of record as follows:

David S. Gaines, Jr., Esquire
dgaines@mkclaw.com
Miller, Kistler & Campbell
720 South Atherton Street, Suite 201
State College, PA  16801

McQUAIDE BLASKO, INC.

By: */s/Philip K. Miles*
Philip K. Miles, Esquire
I.D. No. 209425
pkmiles@mqblaw.com
811 University Drive
State College, PA 16801
Attorney for Defendants